IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| L.R. and M.R.,<br><br>Plaintiffs,<br><br>v.<br><br>BLUE CROSS BLUE SHIELD OF ILLINOIS and MAYER BROWN LLP BENEFIT PLAN,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:22-cv-119<br><br>Howard C. Nielson, Jr.<br>United States District Judge<br><br>FOR PUBLICATION |

Plaintiffs L.R. and M.R. sue Blue Cross Blue Shield of Illinois and the Mayer Brown LLP Benefit Plan, asserting two claims under ERISA (the Employee Retirement Income Security Act, 29 U.S.C. § 1001, *et seq.*): (1) a claim for payment of improperly denied benefits, and (2) a claim for violations of the Mental Health Parity and Addiction Equity Act. Each side moves for summary judgment. Each side also moves to exclude the expert opinions proffered by the opposing side. For the following reasons, the court grants the Defendants' motion for summary judgment, denies the Plaintiffs' motion for summary judgment, and denies the parties' *Daubert* motions as moot.

I.

L.R. was a participant in the Plan and M.R. was a beneficiary. *See* Dkt. No. 42 at 11 ¶ 2; Dkt. No. 47 at 4 ¶ 5. Blue Cross served as the claims administrator for the Plan during the period of M.R.'s treatment at issue in this case. *See* Dkt. No. 42 at 11 ¶ 1; Dkt. No. 47 at 3 ¶ 3.

The Plan provides benefits "for all of the Covered Services described" in the Plan documents that are used "for the diagnosis and/or treatment of a Mental Illness and/or Substance Use Disorder." AR 454. "Inpatient benefits for these Covered Services [are] also . . . provided for the diagnosis and/or treatment of Inpatient Mental illness or Substance Use Disorder in a

Residential Treatment Center." *Id.* The Plan defines a "Residential Treatment Center" as providing, among other services, "24 hour onsite nursing . . . for patients." AR 398.

In 2019 and 2020, M.R. received inpatient treatment for anxiety, depression, and obsessive-compulsive disorder at Mountain Valley Treatment Center and Waypoint Academy. *See* AR 799; AR 945. Mountain Valley is located in New Hampshire, and Waypoint is located in Utah. It is undisputed that Mountain Valley and Waypoint did not provide 24-hour onsite nursing in connection with the inpatient mental health treatment they provided to M.R. *See* AR 9575; Dkt. No. 47 at 2; Dkt. No. 67 at 7.

Blue Cross denied coverage for M.R.'s treatment at Mountain Valley and Waypoint in a series of "explanation of benefits" statements. *See, e.g.*, AR 1393. M.R.'s parents appealed the denials for both facilities. *See* 9571–92. Blue Cross denied both appeals in 2021, stating that Mountain Valley and Waypoint "did not meet the criteria to fall under the residential treatment center definition." AR 3724; *see also* AR 1479.

The Plaintiffs then filed this lawsuit. The court heard oral argument on the parties' summary judgment and *Daubert* motions on November 8, 2024.

**II.**

When, as here, all parties have "moved for summary judgment" on a claim for payment of improperly denied benefits, "summary judgment is merely a vehicle for deciding the case; the factual determination of eligibility for benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor." *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010) (cleaned up). The court reviews a denial of benefits "under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to

determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

The Defendants have not identified any provisions of the Plan that give Blue Cross such authority, and they agree that *de novo* review of the Plaintiffs' denial-of-benefits claim is appropriate. *See* Dkt. No. 42 at 21–22. *De novo* review of such a claim requires the court to "determine whether the administrator made a correct decision." *Brian J. v. United Healthcare Ins., Co.*, 667 F. Supp. 3d 1124, 1130 (D. Utah 2023) (quoting *Niles v. Am. Airlines, Inc.*, 269 F. App'x 827, 832 (10th Cir. 2008)); *accord Robert D. v. Blue Cross of Cal.*, 713 F. Supp. 3d 1159, 1165 (D. Utah 2024). "In reviewing [that] determination, the court is limited to the rationale given by [the administrator] for the denial of benefits." *Brian J.*, 667 F. Supp. 3d at 1130 (citing *Kellogg v. Metropolitan Life Ins. Co.*, 549 F.3d 818, 828–29 (10th Cir. 2008)); *accord Robert D.*, 713 F. Supp. 3d at 1165.

Plaintiffs' Parity Act claim, by contrast, does *not* turn on a "factual determination [based] solely on the administrative record." *LaAsmar*, 605 F.3d at 796 (cleaned up). In resolving the parties' motions for summary judgment on this claim, the court accordingly applies the ordinary summary judgment standard under Federal Rule of Civil Procedure 56(a). *See H.A. v. Tufts Health Plan*, 2025 WL 754143, at *12 (D. Utah Mar. 10, 2025). "[V]iew[ing] the evidence and mak[ing] all reasonable inferences in the light most favorable to the nonmoving party," *id.* (cleaned up), the court considers whether the moving party has shown that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). *De novo* review of the Parity Act claim is appropriate because the claim depends on the proper interpretation of the Act, which is a legal question on which the plan administrator

3

is owed no deference. *See Joseph F. v. Sinclair Servs. Co.*, 158 F. Supp. 3d 1239, 1258 (D. Utah 2016).

### III.

The court first addresses the Plaintiffs' claim for payment of improperly denied benefits under 29 U.S.C. § 1132(a)(1)(B), which creates a private cause of action for a participant or beneficiary of a plan governed by ERISA "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." "It follows that the benefits for which a plaintiff seeks payment must be due under the terms of the plan." *J.W. v. BlueCross BlueShield of Tex.*, 2022 WL 2905657, at *2 (D. Utah July 22, 2022) (cleaned up). "If the benefits in question do not arise under the terms of the plan, the plaintiff has no claim under this subsection." *Id*. (cleaned up); *see also Firestone Tire*, 489 U.S. at 113 (explaining that "ERISA was enacted . . . to protect contractually defined benefits") (cleaned up).

The Plaintiffs argue that the Defendants "failed to provide coverage for M.R.'s treatment in violation of the express terms of the Plan." Dkt. No. 47 at 29. But M.R. received inpatient mental health treatment at Mountain Valley and Waypoint. And the Plan's coverage provision for mental health treatment specifies that "[i]npatient benefits for [its] Covered Services will also be provided for the diagnosis and/or treatment of Inpatient Mental illness . . . in a Residential Treatment Center." AR 454. Because the Plan defines a "Residential Treatment Center" as providing 24-hour onsite nursing, and because Mountain Valley and Waypoint did not provide

that service to their patients, it follows that the Plan did not cover the inpatient mental health treatment that M.R. received.[1]

The Plaintiffs maintain that the Plan covered M.R.'s treatment even if Mountain Valley and Waypoint did not satisfy the Plan's definition of "Residential Treatment Center" because M.R.'s treatment was medically necessary, and because Mountain Valley and Waypoint each satisfy the Plan's definition of a "Provider." But while the Plan generally excludes coverage for services that are *not* medically necessary, *see* AR 479, the Plaintiffs do not identify any provision of the Plan that can plausibly be understood to suggest that *all* medically necessary services are covered. Nor does the Plan's definition of "Provider"—which refers to facilities that are licensed to provide "Covered Services" under the Plan—provide an independently sufficient basis for coverage. *See* AR 395. Regardless of whether Mountain Valley or Waypoint were licensed to offer at least some services "for which benefits will be provided" under the Plan, AR 381, the

---

[1] Because the Plan states that it "also" covers inpatient mental health care in residential treatment centers, it may be interpreted to cover such treatment in certain other facilities, although the parties do not address that possibility in their briefs. AR 454. "Benefits for all of the Covered Services described in" the Plan "are available for the diagnosis and/or treatment of a Mental Illness and/or Substance Use Disorder." *Id.* The Plan generally provides for inpatient treatment in hospitals. *See* AR 424. And it specifically contemplates that inpatient mental health treatment may be covered in hospitals, requiring beneficiaries to obtain preauthorization for such treatment. *See* AR 417. But the Plaintiffs do not argue that Mountain Valley or Waypoint qualified as hospitals under the Plan, and they clearly did not. *See* AR 388 (defining "Hospital" as "a duly licensed institution . . . which provides services under the care of a Physician including the regular provision of bedside nursing by registered nurses"); *see also* Utah Admin. Code R432-100-14(2) (requiring hospitals to "ensure qualified registered nurses are on duty 24 hours a day to give patients nursing care that requires the judgment and special skills of a registered nurse"); N.H. Admin. Code § He-P 802.15(a)(1) (requiring "Hospitals" to comply with Medicare "regulation[s] at 42 CFR Part 482"); 42 C.F.R. § 482.23 (requiring "an organized nursing service that provides 24-hour nursing services").

Further, the Plaintiffs do not point to any provisions of the Plan that contemplate coverage for inpatient mental health treatment at facilities other than hospitals or residential treatment centers, and the court has been unable to locate any such provision. The court accordingly concludes that the Plan does not cover such treatment at other facilities, because it would constitute "[s]ervices or supplies that are not specifically mentioned" in the Plan. AR 480.

5

Plaintiffs' denial of benefits claim turns on whether the *particular* services M.R. received—inpatient mental health treatment at Mountain Valley and Waypoint—were covered under the Plan. And the Plan's relevant coverage provision, which expressly covers inpatient mental health treatment at residential treatment centers, does not cover such treatment at all facilities meeting the Plan's definition of "Provider." *See* AR 454.

In addition, the Plaintiffs argue that the court should reverse Blue Cross's denials of benefits because Blue Cross did not provide "a full and fair review" of its initial denials. 29 U.S.C. § 1133(2). They allege that Blue Cross's denial letters were too cursory to comply with this procedural requirement because they did not include "a meaningful analysis of the Plaintiffs' appeals." Dkt. No. 2 ¶ 46. But even if Blue Cross's denials violated that requirement—and the court does not decide that question—"no remedy [is] warranted for" such a violation in these circumstances. *Brimer v. Life Ins. Co. of N. Am.*, 462 F. App'x 804, 810 (10th Cir. 2012). Courts do not "confer coverage by estoppel" based on such procedural "irregularities." *Loran K. v. Blue Cross and Blue Shield of Ill.*, 2021 WL 4924777, at *8 (N.D. Cal. June 17, 2021). Because M.R.'s inpatient mental health treatment at Mountain Valley and Waypoint clearly was not covered under the Plan, no real "purpose would be served by a further, but procedurally correct, review" of Blue Cross's benefits denials. *Brimer*, 462 F. App'x at 810 (quoting *Sage v. Automation, Inc. Pension Plan & Trust*, 845 F.2d 885, 895 (10th Cir. 1988).

### IV.

The Plaintiffs further argue that the Plan's 24-hour onsite nursing requirement violates the Parity Act. That Act requires that "treatment limitations applicable to . . . mental health or substance use disorder benefits" be "no more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits covered by the plan." 29

6

U.S.C. § 1185a(a)(3)(A)(ii). In addition, a plan may not have "separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits." *Id.*

## A.

To state a claim under this Act, the Plaintiffs must "(1) plausibly allege that the relevant group health plan is subject to MHPAEA; (2) identify a specific treatment limitation on mental health or substance-use disorder benefits covered by the plan; (3) identify medical or surgical care covered by the plan that is analogous to the mental health or substance-use disorder care for which the plaintiffs seek benefits; and (4) plausibly allege a disparity between the treatment limitation on mental health or substance-use disorder benefits as compared to the limitations that defendants would apply to the medical or surgical analog.'" *E.W. v. Health Net Life Ins. Co.*, 86 F.4th 1265, 1283 (10th Cir. 2023) (cleaned up). "Disparate treatment limitations that violate the Parity Act can be either *facial* (as written in the language or the processes of the plan) or *as-applied* (in operation via application of the plan)." *Brian J.*, 667 F. Supp. 3d at 1135 (cleaned up).

While a facial Parity Act challenges "focuses on the *terms* of a plan," such a challenge is not limited to the *four corners* of a plan. *E.W.*, 86 F.4th at 1284 (emphasis added). As with all legal language, the terms of a plan cannot be interpreted "in a vacuum." *United States v. Tate*, 999 F.3d 374, 378 (6th Cir. 2021) (cleaned up). The court must consider the meaning of a plan's terms in context to determine whether the Plan imposes a more stringent treatment limitation on mental health care than on analogous medical or surgical care. *Cf. Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993) (determining whether "[a] law lacks facial neutrality" under the Free Exercise Clause of the First Amendment based on the law's "meaning" as "discernible from the language or context").

7

If a plan imposes the same treatment limitation on mental health benefits that it imposes on analogous medical and surgical benefits, that limitation is not a facial violation of the Parity Act, even if the plan uses different language to apply that limitation to the different types of benefits.[2] For example, if a plan "expressly" applies a limitation to "mental health treatment" while requiring providers of medical and surgical treatment to meet "state licensing" requirements—and if those licensing requirements "mandate" that those providers comply with that same limitation—there is no facial violation. *J.W.*, 2022 WL 2905657, at *6 (citing what was then codified at 29 C.F.R. § 2590.712(c)(4)(iii) (Example 7) and can now be found at Final Rules Under the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008, 78 Fed. Reg. 68240, 68273 (Nov. 13, 2013)).

"By contrast, as-applied challenges focus on treatment limitations that a plan applies in operation." *E.W.*, 86 F.4th at 1284 (cleaned up). Such challenges depend on whether a claims administrator like Blue Cross "differentially *applies* a facially neutral plan term." *Id.* (cleaned up).

B.

The Plaintiffs argue that the Plan's requirement that residential treatment centers offer 24-hour onsite nursing violates the Parity Act for three primary reasons: (1) because the Plan

---

[2] But "nonquantitative treatment limitations" like a 24-hour nursing requirement applied to mental health care need not be *identical* to those applied to analogous medical or surgical care in order to survive challenge under the Parity Act. *Anne M. v. United Behav. Health*, 2022 WL 3576275, at *10 (Aug. 19, 2022). Rather, under the regulations implementing the Parity Act that govern the events at issue here, such limitations need only be (1) "*comparable to*" and (2) "applied no more stringently than for medical/surgical benefits." *Id.* (quoting what was then codified at 29 C.F.R. § 2590.712(c)(4)(iii) (Example 4) and can now be found at Final Rules Under the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008, 78 Fed. Reg. 68240, 68272 (Nov. 13, 2013)). The first of these requirements governs facial challenges. As will be discussed, the second governs as-applied challenges.

expressly applies the 24-hour nursing requirement to residential treatment centers but not to facilities that provide analogous medical and surgical treatment; (2) because the requirement exceeds the relevant state and federal licensing requirements for residential treatment centers, but not for facilities that provide analogous medical and surgical treatment; and (3) because the requirement exceeds generally accepted standards of care for residential treatment centers, but not for facilities that provide analogous medical and surgical treatment.

The Plaintiffs characterize their first argument as a facial challenge. They point out that the Plan does not expressly require providers such as skilled nursing facilities and inpatient rehabilitation facilities to offer 24-hour onsite nursing, even though they offer inpatient medical or surgical care that is analogous to the mental health care offered in residential treatment centers.[3] *Compare* AR 398 (definition of "Residential Treatment Center"), *with* AR 399 (definition of "Skilled Nursing Facility").

---

[3] The court agrees that the care offered by skilled nursing facilities and inpatient rehabilitation care is analogous to the care offered in residential treatment centers for purposes of the Parity Act. Indeed, the preamble to the implementing regulations that govern the events at issue here specifically describes "residential treatment" and "skilled nursing facility care" as "analogous medical services" and further provides that "if a plan or issuer classifies care in skilled nursing facilities or rehabilitation hospitals as inpatient benefits, then the plan or issuer must likewise treat any covered care in residential treatment facilities for mental health or substance use[] disorders as an inpatient benefit." Final Rules Under the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008, 78 Fed. Reg. at 68247, 68260; *see also J.W.*, 2022 WL 2905657, at *5.

The court is not inclined to accept the Plaintiffs' contention that the care offered in an inpatient hospice facility is also analogous to care in a residential treatment center, however. For one thing, the regulatory preamble does not so much as mention inpatient hospice care, let alone treat it as an analog to care in a residential treatment facility. For another, the end-of-life, palliative care offered by inpatient hospice facilities differs in kind from care in a residential treatment facility, which is intended to improve or cure symptoms. *See* AR 388 (defining "Hospice Care Program Service" as "a centrally administered program designed to provide for the physical, psychological and spiritual care for dying persons and their families," with a "goal of . . . allow[ing] the dying process to proceed with a minimum of patient discomfort while maintaining dignity and a quality of life").

But as discussed, there is no facial violation of the Parity Act when a Plan uses different language to apply the same limitation to mental health care, on the one hand, and analogous medical or surgical care, on the other hand. While the Plan does not *expressly* require skilled nursing facilities to offer 24-hour onsite nursing, it does require that such facilities be "duly licensed by the appropriate governmental authority." AR 399. And the Plan appears to treat inpatient rehabilitation as care that will be provided in skilled nursing facilities: although neither the Plan's definitions nor its coverage provisions separately address inpatient rehabilitation, the Plan defines a skilled nursing facility as "an institution or a distinct part of an institution which is primarily engaged in providing comprehensive skilled services and rehabilitative Inpatient care." *Id.* And in Utah and New Hampshire, the states where Mountain Valley and Waypoint are located, facilities providing these inpatient medical or surgical services must offer 24-hour nursing to be licensed.[4] It follows that the Plan's terms, when interpreted in context, impose the

---

Regardless, by incorporating state licensing requirements, the Plan imposes the same requirements for 24/7 nursing presence on inpatient hospice facilities that it imposes on residential treatment centers, skilled nursing facilities, and inpatient rehabilitation facilities. *See* AR 387 (requiring that hospice care providers be "duly licensed"); Utah Admin. Code R432-750-22(1) (defining a "hospice inpatient facility" as "provid[ing] competent hospice-trained nursing staff 24 hours a day"); N.H. Admin. Code § He-P 824.15(a)(1)(b) (requiring a facility providing hospice care to make "[n]ursing services sufficient to meet the nursing needs of the patient . . . [a]vailable . . . 24 hours a day").

[4] For Utah, *see* Utah Admin. Code R432-150-4(3)(f) (requiring "skilled level of nursing care facilit[ies]" to "provide 24-hour licensed nursing services"); Utah Admin. Code R432-103 (covering rehabilitation hospitals as a type of "Specialty Hospital"); Utah Admin. Code R432-101-4(13)(f) (defining a "Specialty Hospital" as providing "continuous registered nursing supervision"). For New Hampshire, *see* N.H. Admin. Code § He-P 803.15(d)(1) (requiring nursing homes, and thus skilled nursing facilities, to provide the "[s]ervices of a licensed nurse . . . 24 hours a day"); N.H. Admin. Code § He-P 802.15(a)(4) (requiring "Rehabilitation Hospitals," which provide inpatient rehabilitation services, to comply with Medicare "regulations at 42 CFR Part 482"); 42 C.F.R. § 482.23 (requiring "an organized nursing service that provides 24-hour nursing services").

same treatment limitation on care in a residential treatment center and analogous medical and surgical care. That limitation thus survives facial challenge under the Parity Act.

*Second*, the Plaintiffs argue that the Plan's 24-hour onsite nursing requirement violates the Parity Act because it imposes a requirement on residential treatment centers that exceeds the licensure requirements they must satisfy, but does not require facilities providing analogous medical or surgical care to exceed their licensure requirements. It is not clear whether the Plaintiffs understand this argument to be a facial or an as-applied challenge. But it fails either way. As discussed, there is no facial violation because the Plan imposes the same 24-hour nursing requirement on residential treatment centers that it imposes on facilities providing analogous medical or surgical care. And to the extent the Plan imposes "extra licensure" requirements only on residential treatment centers, that does not form the basis for an as-applied challenge, which turns on whether a claims administrator—like Blue Cross—applies a facially neutral treatment limitation more strictly to mental health care than to analogous medical or surgical care. The Plaintiffs have identified no evidence that Blue Cross applies the 24-hour nursing requirement differentially by, for example, declining to enforce the requirement against skilled nursing facilities.

What is more, the regulations implementing the Parity Act that govern the events at issue in this case "make clear that a plan does not violate the Parity Act by expressly requiring certain requirements for mental health treatment when those same requirements are mandated by state licensing for analogous medical services." *J.W.*, 2022 WL 2905657, at *6. That is, so long as the

---

Assuming inpatient rehabilitation care at a hospital is also covered under the Plan—although the Plan is not explicit on that point—the Plan defines a "Hospital" as "a duly licensed institution . . . which provides services under the care of a Physician including the regular provision of bedside nursing by registered nurses." AR 388. And under Utah and New Hampshire law, hospitals are required to provide 24-hour nursing. *See* note 1, *supra*.

11

same requirement is imposed "consistently" across the board, a plan does not violate the Parity Act even if the requirement exceeds the licensure requirements for "certain mental health providers" and thus has "a disparate impact" on them. Final Rules Under the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008, 78 Fed. Reg. at 68273.

*Third*, the Plaintiffs argue that the 24-hour nursing requirement violates the Parity Act because it exceeds the generally accepted standards of care for residential treatment centers, but not for analogous facilities that provide medical or surgical care. Like the Plaintiffs' argument regarding licensure requirements, however, this argument is not cognizable under the Parity Act. The Plaintiffs appear to characterize the argument as an as-applied Parity Act challenge because even if the 24-hour nursing requirement is "facially neutral," its "application" has the "effect" (they argue) of disproportionately burdening residential treatment centers. Dkt. No. 67 at 15. But as discussed, an as-applied Parity Act challenge turns on whether a claims administrator differentially applies a facially neutral treatment limitation; such a challenge does not turn on whether the administrator's neutral application of a neutral limitation has a disparate impact on the availability of mental health care. As a result, if (1) a plan imposes a 24-hour nursing requirement for both care in a residential treatment center and analogous medical or surgical care, and (2) the claims administrator neutrally applies that requirement, whether the requirement exceeds generally accepted standards of care for mental health treatment is "irrelevant" under the Parity Act. *J.S. v. Blue Cross Blue Shield of Ill.*, 2024 WL 4308925, at *5 (D. Utah Sept. 26, 2024); *see also M.P. v. BlueCross BlueShield of Ill.*, 2023 WL 8481410, at *4 n.6 (D. Utah Dec. 7, 2023) (noting that the Plaintiffs there "ha[d] not established that the Parity Act permits any analysis of the purportedly different generally accepted standards of care" for residential treatment centers).

To be sure, one judge of this court has reached a contrary conclusion in reliance on the regulations implementing the Parity Act. *See S.B. v. BlueCross BlueShield of Tex.*, 2024 WL 1912224, at *6 (D. Utah May 1, 2024). At the time of the events at issue here, those regulations required that "any processes, strategies, evidentiary standards, or other factors used in applying [a] nonquantitative treatment limitation"—such as a 24-hour nursing requirement—"to mental health or substance use disorder benefits" be "comparable to, and . . . applied no more stringently than, the processes, strategies, evidentiary standards, or other factors used in applying the limitation with respect to [analogous] medical/surgical benefits." Final Rules Under the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008, 78 Fed. Reg. at 68272. That judge reasoned that because generally accepted standards of care were "processes" allegedly used to "create" the 24-hour nursing requirement, those processes were used to apply this requirement "more stringently" to mental health care than to surgical or medical care. *S.B.*, 2024 WL 1912224, at *6. But this interpretation of the regulations is not persuasive. The regulations prohibit the disparate use of "processes" in *applying* treatment limitations, not in *creating* or *establishing* them. Because there is no evidence in the record to support the proposition that Blue Cross uses generally accepted standards of care as processes for determining whether or how to *apply* the 24-hour nursing requirement, the regulations do not support a Parity Act claim here.

In all events, the court need not decide whether a drastic departure from generally accepted standards of care might in some circumstances support a Parity Act claim, because there is no such departure in this case. To the contrary, there is no genuine dispute of fact that the 24-hour onsite nursing requirement comports with generally accepted standards of care for residential treatment centers.

13

The parties agree that one accurate description of these standards is the American Academy of Child and Adolescent Psychiatry's ("AACAP") Principles of Care for Treatment of Children and Adolescents with Mental Illnesses in Residential Treatment Centers. *See* Dkt. No. 42 at 14; Dkt. No. 47 at 21 n.14. As relevant here, the AACAP principles require that residential treatment centers be staffed as follows:

> A registered nurse with at least one year experience in mental health services or a mental health worker (a person with bachelor's degree in psychology, sociology, social work, counseling, nursing education, rehabilitation counseling and at least one year of experience in mental health services) should provide 24 hour developmentally sensitive child supervision, leisure and supportive care. A person with a high school diploma and five years' experience in mental health services may also be a supervisor but on no more than one shift per day.

Dkt. No. 41-29 at 3.

The AACAP principles thus expressly recognize that offering the 24-hour care and supervision of a nurse is *one* way a residential treatment center may comply with generally accepted standards of care. Of course, 24-hour onsite nursing is not the *only* way to comply. A residential treatment center may instead offer the 24-hour care and supervision of a mental health worker with a bachelor's degree. *See id.* And at least one shift of supervision each day may be handled by "[a] person with a high school diploma and five years' experience in mental health services." *Id.* 24-hour onsite nursing may thus fall at the high end of the range of generally accepted practices—but it certainly does not exceed that range. To the contrary, the AACAP principles make clear that 24-hour onsite nursing is one of a very small number of options for staffing residential treatment centers that complies with generally accepted standards of care for those facilities. It follows that "a 24-hour nursing requirement is at least consistent with such

14

generally accepted practices," *M.P.*, 2023 WL 8481410, at *4, and that any Parity Act claim based on an alleged departure from generally accepted standards of care necessarily fails.[5]

### C.

Ultimately, the Plaintiffs' real gripe appears to be that the Plan's 24-hour onsite nursing requirement has a disparate impact on the availability of mental health care under the Plan. The Plaintiffs contend that the "Defendants' actions have the effect of reducing the availability of residential treatment for which the Plan will be required to pay [benefits] to a very small and highly specialized subset of residential treatment facilities which are not in any way typical of the treatment modality," without having a comparable effect on the availability of analogous medical or surgical care. Dkt. No. 47 at 26 (cleaned up).

At the threshold, it is unlikely that such a disparate-impact theory can support a cognizable Parity Act claim. As discussed, courts have recognized two types of Parity Act claims: facial and as-applied. Those claims turn on whether a plan imposes the same (or at least sufficiently comparable) treatment limitations on surgical or medical treatment that it imposes on analogous mental health care, or whether such facially neutral treatment limitations are neutrally applied in practice. Parity Act claims do not turn on whether the neutral application of neutral treatment limitations has a disparate impact on the availability of mental health benefits. Indeed, the regulations implementing the Parity Act that govern the events at issue in this case make clear that "[d]isparate results alone" are insufficient to support a Parity Act claim. Final Rules

---

[5] To the extent courts have held that similar Parity Act claims survive motions to dismiss, those courts did not consider the AACAP principles because they were "extrinsic evidence." *See S.B.*, 2024 WL 1912224, at *6 (declining to consider the AACAP principles but recognizing that, if considered, they "would defeat Plaintiffs' Parity Act claim"); *Brian W. v. Health Care Serv. Corp.*, 2025 WL 306365, at *7 (N.D. Ill. Jan. 27, 2025); *C.M. v. Health Care Serv. Corp.*, 2025 WL 933847, at *6 (N.D. Ill. Mar. 27, 2025). The court is not aware of a case in which such a claim survived a summary judgment motion after the AACAP principles were considered.

Under the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008, 78 Fed. Reg. at 68245, 68246. If the same limitation is neutrally applied to both mental health care and analogous surgical or medical care, there is no Parity Act violation, even if the limitation "ha[s] a disparate impact on certain mental health providers." *Id.* at 68273. Indeed, finding a Parity Act violation where an administrator neutrally applies the same limitation to mental health care and analogous surgical or medical care would turn on its head—and likely contradict—the Act's prohibition of "separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits." 29 U.S.C. § 1185a(a)(3)(A)(ii).[6]

---

[6] The court notes that the Government recently purported to promulgate new regulations implementing the Parity Act. *See* Requirements Related to the Mental Health Parity and Addiction Equity Act, 89 Fed. Reg. 77586 (Sept. 23, 2024). The new regulations remove the example from the old regulations indicating that disparate-impact Parity Act claims are not cognizable and purport to provide that if a facially neutral treatment limitation "contributes to material differences in access to mental health and substance use disorder benefits as compared to medical/surgical benefits in a classification, such differences will be considered a strong indicator that the plan or issuer violates" the Parity Act. 29 C.F.R. § 2590.712(c)(4)(iii)(B). But by their express terms, these new regulations do not apply to group health plans until January 1, 2025. *See* 29 C.F.R. § 2590.712(i)(1)(i). Before that "applicability date," the new regulations specify that group health plans "are required to continue to comply with" the old regulations. *Id.* § 2590.712(i)(1)(ii). Because the dispute in this case concerns events that occurred in 2021 at the latest, the old regulations govern the Defendants' obligations under the Parity Act. *Cf. Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994) (stating that if "Congress has expressly prescribed" that a statute is prospective, "there is no need to resort to judicial default rules" to "determine whether the new statute would have retroactive effect").

What is more, the validity of the new regulations—including their new "material differences in access" standard—is the subject of pending litigation. *See* Complaint at 35 ¶¶ 94–95, *ERISA Indus. Comm. v. Department of Health & Hum. Servs.*, No. 1:25-cv-136 (D.D.C. Jan. 17, 2025) (noting that "in every iteration of the" Parity Act "since 1996," "Congress has consistently imposed disparate-*treatment* liability," and that "courts typically do not read disparate-treatment liability as encompassing disparate-impact liability"). In response to that litigation, the Government announced that it "will not enforce . . . those portions of the" new regulations "that are new in relation to the" old regulations "prior to a final decision in the litigation, plus an additional 18 months." *Statement Regarding Enforcement of the Final Rule on Requirements Related to the Mental Health Parity and Addiction Equity Act*, Department of Labor (May 15, 2025), https://www.dol.gov/agencies/ebsa/laws-and-regulations/laws/mental-health-parity/statement-regarding-enforcement-of-the-final-rule-on-requirements-related-to-

In all events, the court need not decide categorically that disparate-impact claims are *never* cognizable under the Parity Act, even when the application of a facially neutral treatment limitation to mental health care would have an extreme impact or be arbitrary and wholly unjustified. And even counsel for the Plaintiffs conceded at the hearing on the parties' summary judgment motions that "disparate outcomes based on facially neutral language are not *per se* violations of the . . . Parity Act," so long as those "disparate outcomes have a reasonable basis."

In this case, the evidence in the record does not support the conclusion that the Plan's 24-hour nursing requirement has an extreme disparate impact on the availability of mental health care or that the requirement's application to residential treatment centers is arbitrary and wholly unjustified.

The Plaintiffs contend, based on their expert's report and testimony, that it is "uncommon" for residential treatment centers to provide 24-hour onsite nursing and that "there would be so few coverage options" meeting the Plan's requirements that the availability of inpatient mental health "treatment would be limited." Dkt. No. 67 at 21. The Plaintiffs also assert that the 24-hour nursing requirement "artificially inflate[s] the cost of care" for such treatment. Dkt. No. 47 at 26. But the Plaintiffs point to no empirical evidence in the record that supports the proposition that offering 24-hour nursing is more expensive than, for example, complying with the AACAP principles by offering the 24-hour care and supervision of a mental health worker with a bachelor's degree. And the evidence in the record regarding the number of residential treatment centers that offer 24-hour onsite nursing is thin. The Plaintiffs' proffered expert, Dr.

---

mhpaea. And that litigation currently is "be[ing] held in abeyance" while the agencies "reconsider" the new regulations. *Id.*

For all of these reasons, the court evaluates the Plaintiffs' Parity Act claim under the regulations as they existed at the time the claims administrator denied benefits.

Jeffrey Kovnick,[7] testified that of the 24 residential treatment centers that responded to his survey request, five programs—more than 20% of the total—reported that they offered 24-hour onsite nursing. Dkt. No. 41-34 at 25 (92:16–20). The evidence thus does not support a conclusion that the Plan's 24-hour onsite nursing requirement imposes prohibitive costs on residential treatment centers or that it has an extreme effect on the availability of inpatient mental health treatment under the Plan.

In addition, the Plan's 24-hour onsite nursing requirement cannot simply be presumed arbitrary. To be sure, a former judge of this court speculated that the only possible reasons for imposing such a requirement on residential treatment centers would be to "increase the cost of RTC care" or "to limit coverage for RTC care because so few facilities" will satisfy the requirement. *D.B. ex rel. A.B. v. United Healthcare Ins. Co.*, 2023 WL 3766102, at *5 n.5 (D. Utah June 1, 2023). But that judge did not consider the AACAP principles. *See id.* And as discussed, those principles make clear that 24-hour onsite nursing is one of a very small number of options for complying with generally accepted standards of care for residential treatment centers. That judge also focused on the medical and surgical services that many nurses provide, reasoning that the patients in residential treatment centers—who typically are young—will rarely need ordinary nursing services like "mobility assistance." *Id.* But he ignored that some registered nurses specialize in providing mental health care, such as psychiatric nurses, and thus did not

---

[7] While the court does not address the parties' *Daubert* motions, it notes that Dr. Kovnick's expertise regarding staffing in residential treatment centers is quite limited. Dr. Kovnick has worked for only one residential program, and his opinion regarding staffing in other programs appears to be based largely on anecdotal evidence. *See* Dkt. No. 41-35 at 36 (254:13–20) (Q: "And how do you know the staffing of these programs?" A: "I don't know. You know, you just—you just know. You know, you—this is my job. I talk to people.").

18

consider the seemingly obvious utility of such nursing services for residential treatment center patients.

What is more, the Defendants persuasively argue that the requirement is justified for reasons other than limiting coverage. Their proffered expert, Dr. David Rosenberg, opined that patients in residential treatment centers often "have significant behavioral problems" or "mental illnesses," and "that the availability of on-site nursing 24/7 supports improved outcomes" because "aside from a medical doctor, no one is in a better position or has the medical training of a nurse" to handle the "serious adverse events" that "can occur unexpectedly anytime" in such facilities. Dkt. No. 41-30 at 9–10.

The Plaintiffs do not dispute Dr. Rosenberg's opinion in this respect—that 24-hour onsite nursing makes residential treatment centers "safer and more effective"—but instead suggest that any safety benefits derived from 24-hour onsite nursing are outweighed by the costs of providing that service. *See* Dkt. No. 72 at 7. (Though, to reiterate, the Plaintiffs identify no empirical evidence whatsoever to support the proposition that 24-hour nursing costs more than other methods of complying with the AACAP principles.)

In addition, the AACAP principles note that unlike for skilled nursing facilities, there are no federal regulations governing staffing in residential treatment centers and that accreditor oversight is relatively undeveloped for those facilities. *See* Dkt. No. 41-29 at 2. Given this relative lack of oversight, it is surely not arbitrary or unreasonable for a group health plan to choose to exceed licensing and accreditation requirements for residential treatment centers in order to ensure adequate safety, quality control, and professionalism in those programs. It certainly is not the court's job to determine the ideal balance, in the context of residential treatment center staffing, between the labor costs of nursing, on the one hand, and the safety and

professionalism that nurses provide, on the other. But because the Plaintiffs have not disputed that the superior education, experience, and professionalism of nurses benefit the patients of residential treatment centers, the court cannot say that the balance struck by the Plan is arbitrary and wholly unjustified.

\* \* \*

For the foregoing reasons, the court **GRANTS** the Defendants' motion for summary judgment and **DENIES** the Plaintiffs' motion for summary judgment. The court **DENIES** the parties' *Daubert* motions as moot.[8]

**IT IS SO ORDERED**.

Dated this 22nd day of August, 2025.

BY THE COURT:

_____
Howard C. Nielson, Jr.
United States District Judge

---

[8] In addition to bringing a Parity Act claim based on the Plan's 24-hour nursing requirement, the Plaintiffs argue that the Plan violates the Parity Act because it "offers only one type of residential treatment center" but "provides coverage for both Administrator and Non-Administrator skilled nursing facilities." Dkt. No. 47 at 28. But M.R.'s claims were not denied based on this alleged discrepancy. They were denied because the facilities at which M.R. received treatment did not satisfy the Plan's definition of "Residential Treatment Center," and the parties agree that the facilities did not satisfy that definition because they lacked 24-hour onsite nursing. The court accordingly concludes that the "Plaintiffs still would have suffered an alleged injury—the denial of benefits—even if" the Plan had not allegedly violated the Parity Act by covering two types of skilled nursing facilities. *M.S. v. Premera Blue Cross*, 118 F.4th 1248, 1262–63 (10th Cir. 2024). It follows that the Plaintiffs' alleged injury is not "traceable" to this alleged Parity Act violation, and that the Plaintiffs thus lack standing to assert it. *Id.* at 1263 (cleaned up).